1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ROBERT S. DIANA, | ) | 1:05cv00959 JMD |
| | ) | |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## **BACKGROUND**

Plaintiff Robert S. Diana ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") and disability insurance benefits pursuant to Title XVI and Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge.[1]

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge. On December 22, 2005, the Honorable Robert E. Coyle assigned the case to Magistrate Judge Sandra M. Snyder. On July 16, 2007, the Honorable David F. Levi reassigned the case to the undersigned for all purposes.

1

## FACTS AND PRIOR PROCEEDINGS[2]

On February 18, 2003, Plaintiff filed an application for SSI and disability insurance benefits.  AR 68-70.  He alleged disability since April 27, 2002, due to asthma, bronchitis and hearing difficulties (hard of hearing).  AR 68, 86.  After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 46-49, 53-57, 58-59.  On January 10, 2005, ALJ Thomas J. Gaye held a hearing.  AR 462-489.  ALJ Gaye denied benefits on January 28, 2005.  AR 13-23.  On June 1, 2005, the Appeals Council denied Plaintiff's request for review.  AR 7-10.

Hearing Testimony

The hearing convened in Fresno, California.  AR 466.  Plaintiff appeared with his attorney, Robert Christenson.  AR 464, 466.  Vocational expert ("VE") Thomas Dachelet also appeared and testified.  AR 466, 483-487.

At the time of the hearing, Plaintiff was 53 years old with a tenth grade education.  AR 468.  He is divorced and has one child who is married.  AR 468.  He has two grandchildren.  AR 468.  He is 6'1" and weighs about 205.  AR 468.

Plaintiff testified that he has TCMS insurance, which he can use only at Hillman Health Center.  AR 468-469.   Plaintiff made an appointment and believed Dr. Nguyen was assigned to him.  AR 469.  He has been going to Dr. Nguyen for "seven, eight years, nine years."  AR 469.  Plaintiff sees Dr. Nguyen every two or three months for his breathing, asthma and other problems, like his ankle.  AR 469.  Plaintiff testified that his ankle is getting very painful, "coming down to where it's arthritis."  AR 469.

Plaintiff testified that he has a nebulizer.  AR 469.  He has four or five different kinds of inhalers.  AR 469.  The one he had with him is supposed to last a month.  AR 470.  He goes through one a week.  AR 470.  Plaintiff testified that at times it does help and at times it does not.  AR 470.  If he uses it too much, it makes him really jittery, really shaky and scared.  AR 470.

26

27

28

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff testified that he cannot go to work because of his hearing.  AR 470.  He has a problem walking, sitting and standing for long and short periods of time.  AR 470.  He has trouble sitting because it is "like putting pressure on [his] chest" and "like everything's sinking down."  AR 470.  It just hurts.  AR 470.  When he starts wheezing, he has to get up and start walking around.  AR 470.  If he is walking and starts wheezing, he will have to sit down.  AR 470.

In response to questions from his attorney, Plaintiff testified that he has been using a nebulizer for a little over three years.  AR 471.  He uses it a minimum of three times a day, but sometimes he has to use it six or seven times a day, "like every other hour."  AR 471.  He has to use it six or seven times a day at least twice a week.  AR 471.

Plaintiff testified that he has asthma attacks.  AR 471.  An asthma attack is where he cannot catch his breath or cannot breathe and his chest is really tight.  AR 471.  He starts wheezing and he just "lose[s] it basically to where [he] can't breathe."  AR 471.  He has a lot of pain in the chest and he has to use the nebulizer.  AR 471-472.  "A lot of times" the nebulizer does not work and he has to go to the emergency room.  AR 472.  He went to the emergency room via ambulance in December.  AR 472.  They had a thing in his arm "putting all kinds of medicine" and a tube down his throat because he was not breathing.  AR 472.  By the time he got to the hospital, he was breathing on his own.  AR 472.  He occasionally has to go to emergency because of breathing problems.  AR 472.  The nebulizer he has at home "just doesn't cut it."  AR 472.

Plaintiff testified that he sometimes has difficulty standing.  AR 472.  It is the asthma that affects his standing.  AR 472.  If he gets too much of the medicine in him, he will feel queasy or dizzy.  AR 472.  It also hurts "a lot of the time to stand for long periods of time."  AR 472.  His chest just starts hurting and his breathing becomes harder.  AR 473.

Plaintiff testified that he has problems lifting and carrying weight.  AR 473.  He went to the store a couple weeks ago and was carrying a huge pumpkin.  AR 473.  When he got the pumpkin to the house, he was "wheezing up a storm."  AR 473.  His ex-wife said that it was probably because he was stretching his muscles and putting more pressure on his lungs.  AR 473.

Plaintiff testified that he can lift 30 pounds safely.  AR 473.  He could lift maybe 15 or 20 pounds if he had to do it for two to three hours of an eight-hour day.  AR 473.  He can walk around a block and a half before he has to stop to take a couple of deep breaths.  AR 473-474.

Plaintiff testified that he has good days and bad days.  AR 474.  He has bad days at least twice a week or three times a week.  AR 474.  On a bad day, he has to use his nebulizer more, every other hour.  AR 474.  When he does that, the medicine makes him feel really jittery.  AR 474.  His chest hurts a lot, covering his rib cage.  AR 474.  On those days, he cannot walk as fast. AR 474-475.  On a bad day, he does as little as possible to keep him from "over exaggerating [him]self to really get into a bad asthma attack."  AR 475.  He just relaxes most of the time.  AR 475.  He does not lay down.  He reclines and sits down.  AR 475.  When he is lying down, it "kind of makes it worse," like he is stretching his lungs or something.  AR 475.

Plaintiff testified that he was put in the hospital for four or five days in March 2003.  AR 475.  That is the only time in the last two or three years he has spent more than one night in the hospital.  AR 475-476.

Plaintiff testified that his medicine sometimes makes him nervous or jittery.  AR 476.  If he uses his inhaler too much, then it makes him shaky, but it helps him.  AR 476.  They are called emergency relievers.  AR 476.

Plaintiff testified that he has hearing loss in his ears.  AR 476.  He could hear his legal counsel okay.  AR 476.  He has been fitted for hearing aids many times.  AR 476.  He has used hearing aids.  AR 476.  They do not work for him because the louder he hears things the louder the ringing gets in his ears.  AR 476-477.  He always can hear things, but he cannot understand or make out what is being said.  He has had two hearings aids.  AR 477.  When he was living in Los Angeles years ago, he was fitted for over-the-ear type aids, but they just made the ringing louder and harder for him to hear.  AR 477.  Plaintiff thought that he could hear multiple sounds in a room.  AR 477.  The ringing goes on 24/7, whether he is sleeping or not.  AR 478.  A lot of things make it louder, like when a speaker comes on in a store or if he is next to screaming kids in a basket with their mother.  AR 478.

Plaintiff testified that a lot of times he has problems hearing people on the telephone.  AR 478.  He cannot hear on his friend's cell phone.  AR 478.  He uses his friend's "landline" because it has a volume control on it.  AR 478.  On pay phones, he has problems hearing.  When he does hear on them, it "comes in really fuzzy."  AR 478.  He usually has a lot of problems hearing women.  AR 478.  He guessed it was because women are a softer tone.  AR 478-479.  He has problems hearing a lot of men, too.  AR 479.

Plaintiff testified that he volunteers at the Salvation Army and at a thrift store.  AR 479.  Where he lives, he usually helps his landlord with the animals.  AR 479.  He does not have a car.  AR 479.  He gets around by bus.  AR 479.  His ex-wife brought him to the hearing.  AR 479.  He is "kind of afraid to do anything really very active."  AR 479.

Plaintiff testified that at one time he had a class B license.  AR 479.  It is not valid or active at this time because he could not renew his medical certificate.  AR 479-480.  He could not pass his hearing test to renew the medical certificate.  AR 480.

In response to questions from the ALJ, Plaintiff testified that he had been to the emergency three times in 2004.  AR 480.  The last time they took him by ambulance.  AR 480.  Plaintiff testified that he smokes, but has cut down drastically.  AR 482.  He does not drink.  AR 482.  He never has had a drinking problem.  AR 482.  He will have "a beer or whatever sociably."  AR 482.  He drinks once in a blue moon.  AR 482.  He never has had a problem with drugs or alcohol.  AR 483.  He has used cocaine only one time.  AR 483.  It was forced on him to try.  AR 483.  It has been "a long while" since he has used marijuana.  AR 483.

VE Thomas Dachelet also testified.  AR 483.  The VE indicated that he had a clear understanding of Plaintiff's past relevant work.  AR 484.  For the first hypothetical, the ALJ asked the VE to assume a person of the Plaintiff's age, education and past work experience.  AR 485.  The ALJ also asked the VE to assume a person who could work at the light exertional level, who could not have even moderate exposure to dust, fumes or gases and who could not work at any jobs that would require good hearing, such as a dispatcher or telephone solicitor.  AR 485.  The VE testified that this hypothetical would permit work at the poultry plant, which is light physical demand and unskilled.  AR 485.  The VE testified that if OSHA does not require

1  masking or specifics, then the issue of pulmonary irritants really does not apply and plant work in

2  poultry would be allowed.  AR 485.  The VE informed the ALJ that OSHA does not require

3  masks.  AR 486.

4       For the next hypothetical, Plaintiff's legal counsel asked the VE to assume a person of

5  Plaintiff's age, education and work experience.  AR 486.  Plaintiff's legal counsel also asked the

6  VE to assume this person has asthma attacks one to two times a week and, on average, would not

7  be able to function and work in a workplace two to three days per week.  AR 486.  The VE

8  testified that this person would not be able to perform Plaintiff's past relevant work.  AR 486.

9       For the next hypothetical, Plaintiff's legal counsel asked the VE to assume a person of

10 Plaintiff's age, education and work experience.  AR 486.  This person could sit about four hours

11 in an eight-hour day, could stand about two hours in an eight-hour day, would need to take

12 unscheduled breaks every two to three hours for 15 and 20 minutes at a time, could lift 10 pounds

13 rarely, less than 10 pounds occasionally, and never 20 pounds, could twist, stoop, bend, crouch,

14 climb stairs or climb ladders rarely, and would need to avoid exposure to environmental

15 restrictions.  AR 486-487.  The VE testified that this person would not be able to perform

16 Plaintiff's past relevant work as normally found in the national economy.  AR 487.  This person

17 would not be able to perform other work in the national economy.  AR 487.  The VE testified

18 that if this person would miss more than four days a month because of his impairments or

19 treatment, this person would not be able to perform Plaintiff's past relevant work.  AR 487.  This

20 person would not be able to perform competitive work as normally found in the national

21 economy.  AR 487.

22      The ALJ asked the VE to add to the ALJ's hypothetical two additional mental limitations:

23 moderate limitation on ability to understand and remember detailed instructions and moderate

24 limitation in the ability to carry out detailed instructions.  AR 487.  The VE testified there is no

25 change.  AR 487. [3]

26

27

28

[3]AR 488 and any remaining testimony contained therein is not included in the record before this Court.

1     <u>Medical Evidence</u>

2     On March 21, 1994, Plaintiff sought treatment at Tulare District Hospital for his asthma.

3 AR 174.  Plaintiff's principal diagnosis was complication of bronchial asthma.  AR 174.  He also

4 had sensorineural hearing loss and bronchitis.  AR 174.

5     On September 11, 1999, Plaintiff sought treatment at Tulare District Hospital for

6 difficulty breathing and chest pain.  AR 173.  On January 11, 2000, Plaintiff again sought

7 treatment at Tulare District Hospital for difficulty breathing.  AR 172.

8     On February 14, 2001, Plaintiff sought emergency treatment at Nanticoke Memorial

9 Hospital ("NMH") in Delaware for acute asthma and bronchitis.  AR 162, 382-386.  Plaintiff

10 complained of dry heaves and chest pain from coughing.  AR 384.  A chest examination revealed

11 clear lung fields.  AR 386.  Plaintiff's heart and pulmonary vascularity were within normal limits.

12 AR 386.

13     On March 29, 2001, Plaintiff sought emergency treatment at NMH for shortness of

14 breath.  AR 161, 375-381.  On examination, Plaintiff had diffuse inspiratory and expiratory

15 wheezes.  AR 376.  He was assessed with acute dyspnea and acute exacerbation of asthma.  AR

16 376.  He was advised to follow instructions for asthma, to use his inhalers and to quit smoking.

17 AR 161.

18     On September 17, 2001, Plaintiff sought emergency treatment at NMH for wheezing and

19 coughing.  AR 160, 369-374.  He had asthma exacerbation.  AR 369.  On examination, Plaintiff

20 had diffuse wheezes.  AR 369.  He was prescribed albuterol and was instructed to quit smoking

21 "or feel this way every day forever."  AR 160.

22     On October 13, 2001, Plaintiff sought emergency treatment at NMH for asthma, difficulty

23 breathing and rib pain.  AR 363-366, 368.  Plaintiff again sought emergency treatment at NMH

24 on October 14, 2001, for an upper respiratory infection and rib/chest pain.  AR 358-361.  He was

25 prescribed medication.  AR 361.

26     On October 17, 2001, Plaintiff sought treatment at Dorchester General Hospital in

27 Maryland for right side/right rib pain.  AR 399-404.  Views of Plaintiff's right ribs revealed a

28 nondisplaced fracture of the 9th rib.  AR 397.

On December 5, 2001, Plaintiff sought emergency treatment at NMH for his asthma.  AR 349-355.  Plaintiff reported that he was exposed to welding smoke and began to wheeze.  AR 349.  He did not have his albuterol metered dose inhaler to treat himself.  AR 349.  A portable chest radiograph revealed a stable radiographic appearance of the chest without acute infiltrate.  AR 355.  Plaintiff was assessed with acute asthma onset with exposure to welding flux smoke.  AR 340.  He was instructed to quit smoking and was given medications, including an albuterol inhaler and steroids.  AR 349.

On December 14, 2001, Plaintiff's chest films revealed vague nodular density near the left costophrenic angle on the PA view.  AR 396.  The remainder of the fields were clear with no effusions.  AR 396.

On January 9, 2002, Plaintiff sought emergency treatment at NMH.  AR 340-346.  Plaintiff reported progressive shortness of breath, a severe headache, nausea, vomiting and dry heaves.  AR 340.  On physical examination, Plaintiff had inspiratory and expiratory wheezes diffusely.  AR 340.  A CT scan of Plaintiff's head was negative.  AR 340, 347.  Plaintiff was diagnosed with acute respiratory distress, exacerbation of asthma, and acute cephalgia, etiology unclear.  AR 341.  Plaintiff was prescribed medications and advised to stop smoking.  AR 341.

On May 3, 2002, Plaintiff received emergency treatment at Dorchester Memorial Hospital in Maryland for pain in his left ankle.  AR 388-393.  Views of Plaintiff's left ankle revealed normal bones, joints and visible soft tissues.  AR 395.  Plaintiff was diagnosed with left ankle pain and psoriasis.  AR 393.  He was prescribed Naprosyn and an "Ace" was applied to his left ankle.  AR 388, 393.

On August 28, 2002, Plaintiff sought treatment at Tulare District Hospital for a right hand injury after striking a wall with his clenched fist.  AR 191-194.  Views of Plaintiff's right hand showed a mildly displaced and impacted intraarticular fracture involving the base of the fifth metacarpal.  AR 195.  He was given a metal splint with a securing wrap and Vicodin.  AR 192.  Plaintiff returned to Tulare District Hospital on August 30, 2002, for complaints of pain radiating up his forearm and his Vicodin not working.  AR 189, 190.  On examination, he had diffuse

swelling of his right hand and wrist.  AR 190.  His hand was re-splinted and he was given

additional Vicodin.  AR 190.

On October 17, 2002, Plaintiff sought treatment at Tulare District Hospital for difficulty

breathing.  AR 170, 185-188.  He was wheezing and unable to complete sentences greater than 2-

3 words.  AR 185.  Plaintiff received an albuterol nebulizer treatment.  AR 185.  Views of

Plaintiff's chest showed bronchial wall thickening at the bases, right greater than left, with no

focal consolidations, effusions or evidence of a pneumothorax.  AR 188.  He was diagnosed with

acute respiratory distress and COPD exacerbation.  AR 187.

On November 26, 2002, Plaintiff sought treatment at Tulare District Hospital for a right

hand injury caused by striking a wall.  AR 179-183.  He was given a metal wrist splint and "ace

wrap."  AR 180.

On December 4, 2002, Plaintiff saw Truc Nguyen, M.D., for a regular follow-up visit.

AR 169.  Plaintiff complained of a cough with no purulent sputum.  AR 169.  Dr. Nguyen noted

that Plaintiff did not smoke.  AR 169.  On examination, Plaintiff had rhonchi but no obvious

wheezing.  AR 169.  Dr. Nguyen assessed Plaintiff with allergic rhinitis, low grade asthma and

possible onset of diabetes mellitus.  AR 169.

On January 14, 2003, Plaintiff saw Dr. Nguyen for follow-up of lab work.  AR 167.  Dr.

Nguyen reported that Plaintiff was still smoking and was producing some "purulent looking

sputum."  AR 167.  Plaintiff claimed to have been smoking for at least 35 years.  AR 167.  On

examination, Plaintiff had some mild wheezing, but no acute distress.  AR 167.  Dr. Nguyen

assessed Plaintiff to be "most likely diabetic" based on hemoglobin standards.  AR 167.  Plaintiff

also was assessed with asthma, COPD and chronic bronchitis.  AR 167.  Dr. Nguyen advised

Plaintiff to stop cigarette smoking.  Plaintiff was prescribed medications and an inhaler.  AR 167.

On January 25, 2003, Plaintiff sought emergency treatment at Tulare District Hospital for

difficulty breathing.  AR 165, 176.  He had coarse wheezes and was diagnosed with asthma.  AR

176-178.

On February 16, 2003, Plaintiff sought emergency treatment at Kaweah Delta Health Care

District for his asthma.  AR 199, 200-202, 334, 335-339.  Plaintiff complained of wheezing and

1  shortness of breath, along with chest and back pain.  AR 200, 335.  On examination, Plaintiff had

2  moderate bilateral expiratory wheezes.  AR 336.  His respiratory status improved after aerosol

3  treatment.  AR 337.  He was diagnosed asthmatic with acute bronchitis.  AR 337.

4          On March 7, 2003, Plaintiff saw Homayoun Sohrabi, M.D., for asthma.  AR 253.

5  Plaintiff reported going to the emergency room the previous night for asthma treatment.  AR 253.

6  On examination, Plaintiff had bilateral wheezing and decreased breath sounds.  AR 253.  After

7  two breathing treatments, Plaintiff continued to have shortness of breath and Dr. Sohrabi

8  recommended direct admission to the hospital.  AR 207, 253.  Initially, Plaintiff did not desire

9  hospitalization, but changed his mind.  AR 253.  That same day, Plaintiff was admitted to Tulare

10  District Hospital for shortness of breath.  AR 204-210.  He was started on IV Zithromax,

11  nebulizer breathing treatments and steroids.  AR 204, 208.  Plaintiff's chest X-ray showed mild

12  cardiomegaly and right sided aortic arch.  AR 204, 210.  He was diagnosed with asthma

13  exacerbation and as a smoker.  AR 204.  He was discharged from the hospital on March 11,

14  2003, after completing a 5-day course of Zithromax.  AR 204.

15          On March 25, 2003, Plaintiff saw Dr. Nguyen for complaints of nasal congestion.  AR

16  252.  Dr. Nguyen noted that about two weeks prior Plaintiff had been discharged from the

17  hospital following acute aggravation of asthma.  AR 252.  On examination, Plaintiff's lungs were

18  clear with good air exchange.  AR 252.  Dr. Nguyen assessed Plaintiff with recent aggravation of

19  asthma, now stable, and hyperglycemia.  AR 252.

20          On May 20, 2003, audiologist Tedd Shurson, M.A./CCC, completed a consultative

21  examination of Plaintiff.  AR 211-212, 213.  Audiometric results showed a severe loss in the

22  right ear and moderate less in the left ear.  AR 211.  Mr. Shurson reported that use of mild to

23  moderate power amplification in the left ear improved Plaintiff's aided speech reception.  AR

24  211.  Mr. Shurson concluded that without use of amplification Plaintiff would have significant

25  difficulty communicating even at close distance.  AR 211.  Plaintiff reported that amplification

26  made the ringing in his ears more noticeable.  AR 211.  Mr. Shurson opined that due to the length

27  of time that Plaintiff had gone without hearing and Plaintiff's negative feelings regarding use of

28  amplification, the potential for improvement was guarded.  AR 211.

On May 27, 2003, Tomas B. Rios, M.D., completed a consultative internal medicine examination of Plaintiff.  AR 214-217.  Plaintiff complained to Dr. Rios of asthma.  AR 214.  On physical examination, Plaintiff was not in severe respiratory distress.  AR 215.  Examination of the chest and lungs revealed expiratory wheezing.  AR 216.  Dr. Rios diagnosed Plaintiff with asthma.  AR 216.  Dr. Rios opined that Plaintiff's allegation of labor restricting complications from asthma was significant as he had diffuse expiratory wheezing.  AR 216.  There was no clinical evidence of early pulmonary hypertension, no clubbing of the fingers, no cyanosis, no neck vein engorgement and no edema.  AR 216.  The pulmonary function test showed combined mild restrictive/obstructive lung process.  AR 216, 218-220, 221-222.  Dr. Rios concluded that Plaintiff should be precluded from working in an enclosed environment where there is frequent exposure to smoke, dust or fumes that could exacerbate his underlying reactive airway disease.  AR 216.  Dr. Rios noted that Plaintiff was able to converse with him, but "had slightly noticeable hearing difficulty."  AR 217.

On June 3, 2003, Plaintiff saw Dr. Nguyen for complaints of "recent increase of frequent asthma attacks."  AR 251.  On examination, Plaintiff was not in acute distress.  AR 251.  Auscultation revealed moderate wheezing with no obvious rales.  AR 251.  Dr. Nguyen assessed Plaintiff with frequent recurrence of persisting asthma and prescribed a low dose of steroid maintenance.  AR 251.

On July 5, 2003, Plaintiff sought emergency treatment at Tulare District Hospital for complaints of fever, abdomen pain and headache.  AR 421, 424-427.  Examination of Plaintiff's abdomen revealed no evidence of obstruction.  AR 428.  He was diagnosed with possible billary colic and myalgias.  He was prescribed Vicodin for pain.  AR 426-427.

On July 22, 2003, Brian Ginsburg, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 227-234.  Dr. Ginsburg opined that Plaintiff had no exertional, postural, manipulative, or visual limitations.  AR 228-230.  However, Plaintiff had limited hearing and should avoid jobs requiring good hearing, such as dispatcher or telephone solicitor.  AR 231.  Plaintiff also had to avoid concentrated exposure to fumes, odors, dusts, gases, poor

1   ventilation, etc.  AR 231.  Dr. Ginsburg noted that Plaintiff had to avoid working around

2   respiratory irritants due to asthma.  AR 231.

3       On July 31, 2003, Plaintiff saw Dr. Nguyen for recent aggravation of wheezing.  AR 249.

4   On examination, Plaintiff had expiratory wheezing, but no retractions.  AR 249.  Dr. Nguyen

5   prescribed medications.  AR 249.

6       On October 6, 2003, Plaintiff sought treatment for trouble breathing and coughing.  AR

7   248.

8       On November 15, 2003, Plaintiff sought emergency treatment at Tulare District Hospital

9   for difficulty breathing.  AR 413-414, 415-419, 420.  Plaintiff complained of pain all across his

10  chest.  AR 416.  Plaintiff was given nebulizer treatments, Albuterol and Prednisone.  AR 416,

11  420.  He was diagnosed with exacerbation of asthma.  AR 420.

12      On December 4, 2003, psychiatrist Michael S. Barnett, M.D., completed a consultative

13  psychiatric evaluation of Plaintiff.  AR 254-256.  Plaintiff complained that he did not like being

14  around people and had felt that way for a long time.  AR 254.  This feeling had gotten worse in

15  the last six months since his brother died.  AR 254.  On mental status exam, Plaintiff was not in

16  acute psychic distress.  AR 255.  His answers were coherent and organized, however, he often

17  answered vaguely.  AR 255.  Dr. Barnett opined that some of Plaintiff's responses "appeared to

18  be confabulatory and/or contradictory."  AR 255.  Plaintiff's mood was depressed and his affect

19  was blunted.  AR 255.  He had psychotic symptoms.  AR 255.

20      Dr. Barnett diagnosed Plaintiff with dysthymia, polysubstance abuse in remission, and

21  personality disorder, not otherwise specified, with antisocial and dependent traits.  AR 256.  Dr.

22  Barnett assigned Plaintiff a Global Assessment of Functioning ("GAF") of 58.  AR 256.  Dr.

23  Barnett opined that Plaintiff had "no psychiatric symptoms that would interfere with his ability to

24  do work-related tasks in an eight-hour work situation."  AR 256.  He would be able to understand

25  and remember simple, but not complex, work-related instructions and tasks.  AR 256.  He would

26  be able to sustain focused attention and concentration long enough to complete simple, routine

27  work-related tasks in a timely and appropriate way without special or additional supervision.  AR

28  256.  Dr. Barnett further opined that, although Plaintiff had limited social skills and antisocial

and dependent personality disorder traits, Plaintiff would be able to interact independently, appropriately and effectively with coworkers, supervisors and the public.  AR 256.  Plaintiff would not have difficulty adapting to changes, hazards or stressors in the work environment.  AR 256.  Dr. Barnett concluded that Plaintiff's prognosis was guarded since his symptoms "could always progress."  AR 256.

On December 15, 2003, Plaintiff saw Dr. Nguyen for nasal congestion.  AR 442.  Plaintiff had an upper respiratory infection with significant allergic rhinitis.  AR 442.  Dr. Nguyen noted that Plaintiff's asthma "seems stable."  AR 442.  Plaintiff was advised of "the absolute need to stop cigarette smoking."  AR 442.

On December 22, 2003, Plaintiff sought emergency treatment at Tulare District Hospital for complaints of numbness in his right hand.  AR 405-406, 408-412.  Plaintiff was diagnosed with ulnar nerve compression syndrome and given a wrist splint.  AR 411.

On January 6, 2004, Plaintiff saw Dr. Nguyen for mild asthma activity.  AR 441.  Dr. Nguyen noted that Plaintiff would have nerve conduction studies done later in the month.  AR 441.  Dr. Nguyen assessed Plaintiff's asthma as stable.  AR 441.  Dr. Nguyen also indicated that Plaintiff "most likely" had "some degree of ulnar neuropathy secondary to previous injury of right hand."  AR 441.

On January 15, 2004, James B. Peery, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 257-264.  Dr. Peery opined that Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand and/or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  AR 258.  He could push and/or pull without limitation, other than as shown for lift and/or carry.  AR 258.  He had no postural, manipulative, visual or communicative limitations.  AR 259-261.  He had asthma precautions to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  AR 261.

On January 16, 2004, psychiatrist Archimedes Garcia, M.D., completed a Mental Residual Functional Capacity Assessment form.  AR 269-272.  Dr. Garcia opined that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions and moderate limitations in the ability to carry out detailed instructions.  AR 269.  Dr. Garcia

concluded that Plaintiff should be able to understand, remember and carry out simple, not detailed directions for extended periods, should be able to sustain concentration, persistence and pace for extended periods, should be able to interact appropriately with supervisors, coworkers and the public, and should be able to adapt to changes in a work setting. AR 271. On January 16, 2004, Dr. Garcia also completed a Psychiatric Review Technique form. AR 273-286. Dr. Garcia did not identify any functional limitations. AR 273-286.

On February 23, 2004, Plaintiff saw Dr. Nguyen for numbness and discomfort in the right arm and right wrist. AR 440. Plaintiff also reported wheezing "on and off." AR 440. On examination, auscultation of the lungs revealed mild wheezing with good air exchange. AR 440. Dr. Nguyen assessed Plaintiff with low grade asthma activity and neuropathy of the right arm from a previous injury. AR 440. Plaintiff was referred to the neurology clinic. AR 440.

On March 30, 2004, Plaintiff saw Boota Singh Chahil, M.D., for complaints of right hand numbness. AR 439. On examination, Plaintiff's extremities had no edema. AR 439. His power and deep tendon reflexes were normal. AR 439. Dr. Chahil diagnosed hand numbness with an unclear etiology. AR 439. Dr. Chahil also opined that Plaintiff had mild carpal tunnel syndrome, which was "unlikely to cause this problem." AR 439.

On July 13, 2004, Plaintiff saw Dr. Nguyen for a rash. AR 295. Dr. Nguyen assessed Plaintiff with asthma, hypercholesterolemia, allergic rhinitis and skin rash. AR 295. Dr. Nguyen described Plaintiff's asthma as "stable." AR 295. Plaintiff was provided with additional asthma medication. AR 296.

On August 27, 2004, Plaintiff sought emergency treatment at Tulare Local Healthcare District for left ankle pain. AR 303, 304-307. The provider noted "prob mild gout." AR 307. Medical imaging showed that the bony contours and soft tissues of Plaintiff's left ankle were unremarkable. AR 311. There was no definite evidence of fracture and/or area of dislocation. AR 311.

On September 21, 2004, Plaintiff saw Dr. Nguyen for follow-up of his left ankle pain. AR 294. Dr. Nguyen noted that Plaintiff had been treated for acute gout with Indocin, which made Plaintiff sick and shaky. AR 294. Plaintiff reportedly stopped taking the Indocin. AR

1   294.  On examination, Plaintiff's left ankle had mild swelling, but no acute redness or local heat.

2   AR 294.  Plaintiff also had a very flat arch of the left foot.  AR 294.  Dr. Nguyen opined that

3   Plaintiff might be developing osteoarthritis of the left ankle.  AR 294.

4        On November 3, 2004, Plaintiff sought treatment in the emergency department at Kaweah

5   Delta Health Care District.  AR 325-331, 332.  Plaintiff complained of asthma and difficulty

6   breathing.  AR 326.  On examination by a nurse practitioner, Plaintiff had moderate bilateral

7   inspiratory and expiratory wheezes.  AR 327.  Plaintiff was not in acute respiratory distress.  AR

8   327.  After aerosol nebulizer treatment, Plaintiff had diminished breath sounds with expiratory

9   wheezes and increased air exchange.  AR 328.  Plaintiff was diagnosed with asthma and an acute

10  upper respiratory infection.  AR 328.

11       On November 9, 2004, Dr. Nguyen completed a Medical Report form for the County of

12  Tulare Health and Human Services Agency.  AR 312.  Dr. Nguyen opined that Plaintiff was

13  unable to work or to participate in Welfare-to-Work program activities for the period from

14  November 8, 2004 to February 8, 2005.  AR 312.

15       On December 8, 2004, Plaintiff sought treatment in the emergency department at Kaweah

16  Delta Health Care District for difficulty breathing.  AR 314, 315-322, 323-324.  Plaintiff arrived

17  via ambulance for evaluation of dyspnea.  AR 315.  On arrival, he was in slight distress with

18  wheezing and "diminished breath sounds upper lobes."  AR 316.  On examination, he had

19  moderate bilateral expiratory wheezes, which resolved after medication.  AR 316-317.  Chest

20  films revealed no infiltrates, no effusions, normal cardiac silhouette, no pneumothorax and

21  normal mediastinum.  AR 317, 321-322.  Plaintiff was diagnosed with asthma exacerbation and

22  acute bronchitis.  AR 317.

23       On December 14, 2004, Plaintiff saw Dr. Nguyen for follow-up of his asthma and lab

24  results.  AR 293.

25       On December 16, 2004, Dr. Nguyen completed a Pulmonary Residual Functional

26  Capacity Questionnaire.  AR 287-291.  Dr. Nguyen diagnosed Plaintiff with severe asthma,

27  chronic bronchitis, arthritis, severe allergic rhinitis and a severe hearing impairment.  AR 287.

28  Dr. Nguyen identified Plaintiff's symptoms to include shortness of breath, chest tightness,

wheezing, rhonchi, episodic acute asthma, episodic acute bronchitis, fatigue, palpitations and coughing.  AR 287.  Dr. Nguyen opined that Plaintiff's symptoms were severe enough to interfere with attention and concentration frequently and he was incapable of even "low stress" jobs.  AR 288.  Dr. Nguyen indicated that Plaintiff could sit 1 hour before needing to get up, could stand for 30 minutes before needing to sit down or walk around, could sit about 4 hours in an 8-hour working day, and could stand/walk about 2 hours in an 8-hour working day.  AR 289.  He would need unscheduled breaks every 2-3 hours.  AR 289.  He could lift less than 10 pounds occasionally, 10 pounds rarely and 20 or 50 pounds never.  AR 290.  He rarely could twist, stoop (bend), crouch, climb ladders and climb stairs.  AR 290.  He had to avoid all exposure to extreme cold, extreme heat, high humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents/cleaners and chemicals.  AR 290.  Dr. Nguyen estimated that Plaintiff likely would be absent from work as a result of his impairments or treatment more than four days per month.  AR 291.  Dr. Nguyen also indicated that Plaintiff had a "hearing difficulty."  AR 291.

ALJ's Findings

The ALJ determined that Plaintiff met the requirements for Disability Insurance Benefits and was insured for benefits through the date of the decision.  AR 22.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability.  AR 22.  The ALJ also found that Plaintiff's asthma, dysthymia, polysubstance abuse in remission and personality disorder were considered "severe."  AR 22.  The ALJ concluded that those impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  AR 22.  The ALJ found that Plaintiff's allegations regarding his limitations were not totally credible.  AR 20-21, 22.  The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work or work that required maximum lifting of twenty pounds and frequent lifting of ten pounds with environmental limitations related to asthma precautions of avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  AR 23.  Plaintiff had the mental RFC to understand, remember and carry out simple instructions for extended periods, sustain concentration, persistence and pace, interact

1    appropriately with coworkers, supervisors and the public and adapt to changes in a work setting.

2    AR 23.  He had moderate limitations in the ability to understand, remember and carry out

3    detailed instructions.  AR 23.  The ALJ concluded that Plaintiff's impairments did not prevent

4    him from performing his past relevant work as a poultry plant production worker.  AR 23.

5    Therefore, the ALJ found that Plaintiff was not under a "disability."  AR 23.

6                                         **SCOPE OF REVIEW**

7            Congress has provided a limited scope of judicial review of the Commissioner's decision

8    to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

9    the Court must determine whether the decision of the Commissioner is supported by substantial

10   evidence.  *42 U.S.C. § 405(g)*.  Substantial evidence means more than a mere scintilla,

11   *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v.*

12   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

13   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

14   (internal quotation marks and citation omitted).  The record as a whole must be considered,

15   weighing both the evidence that supports and the evidence that detracts from the Commissioner's

16   conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and

17   making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v.*

18   *Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's

19   determination that the claimant is not disabled if the Commissioner applied the correct legal

20   standards and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez*

21   *v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

22                                            **REVIEW**

23           In order to qualify for benefits, a claimant must establish that he is unable to engage in

24   substantial gainful activity due to a medically determinable physical or mental impairment that

25   has lasted or can be expected to last for a continuous period of not less than 12 months.  *42*

26   *U.S.C. § 1382c* (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

27   such severity that he is not only unable to do his previous work, but cannot, considering his age,

28   education, and work experience, engage in any other kind of substantial gainful work that exists

1  in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The

2  burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

3  1990).

4       In an effort to achieve uniformity of decisions, the Commissioner has promulgated

5  regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

6  C.F.R. § § 404.1520(a)-(g), 416.920 (a)-(g) (2005). Applying the evaluation process in this case,

7  the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since the alleged

8  onset of disability; (2) has an impairment or a combination of impairments that is considered

9  "severe" (asthma, dysthymia, polysubstance abuse in remission and personality disorder) based

10  on the requirements in the Regulations (20 C.F.R. § 416.920(c) (2005)); (3) does not have an

11  impairment or combination of impairments that meets or equals one of the impairments set forth

12  in Appendix 1 to Subpart P of Part 404; and (4) has the residual functional capacity to perform

13  his past relevant work as a poultry plant production worker. AR 22-23.

14       Here, Plaintiff contends that the ALJ improperly rejected the opinion of his treating

15  physician regarding his functional capacity.

16                         **DISCUSSION**

17  A.    Opinions of Treating Physicians

18       Plaintiff alleges that the ALJ erred in failing to adopt the assessment of his limitations by

19  treating physician, Truc Nguyen, M.D. He further contends that with the limitations imposed by

20  Dr. Nguyen he could not perform his past relevant work or any other work in the national

21  economy. To support his argument, Plaintiff asserts that the opinion of a treating physician is

22  entitled to greater weight than the opinions of consultative examiners. Plaintiff's assertion is

23  correct. The opinions of treating doctors should be given more weight than the opinions of

24  doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998);

25  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not

26  contradicted by another doctor, it may be rejected only for "clear and convincing" reasons

27  supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating

28  doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without

providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

In *Orn v. Astrue, ___ F.3d ___ (9th Cir. 2007)*(2007 WL 2034287), the Ninth Circuit reiterated its position regarding the ALJ's acceptance of the opinion of an examining physician over that of a treating physician.  "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not '"substantial evidence."'  *Orn*, at *5; *Murray*, 722 F.2d at 501-502.  "By contrast, when an examining physician provides 'independent clinical findings that differ from the findings of the treating physician' such findings are 'substantial evidence.'"  *Orn*, at *5; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985).  Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not herself considered, *see Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

If there is "substantial evidence" in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to "controlling weight."  20 C.F.R. § 404.1527(d)(2).  In that event, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician.  Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference."

1  SSR 96-2p; *Orn* at *6.  "In many cases, a treating source's medical opinion will be entitled to the

2  greatest weight and should be adopted, even if it does not meet the test for controlling weight."

3  SSR 96-2p; *Orn* at *6.

4        Here, the consultative examiner, Dr. Rios, performed a physical examination of Plaintiff.

5  Dr. Rios agreed with the diagnosis of asthma provided by Plaintiff's treating physician.  AR 216.

6  Dr. Rios did not offer an alternative diagnosis, but did perform a pulmonary function test.  AR

7  216, 218-220, 221-222.  In order to reject Dr. Nguyen's conclusions regarding Plaintiff's

8  functional capacity in favor of a non-treating physician, the ALJ must give "specific and

9  legitimate reasons" supported by substantial evidence in the record, such as differing diagnoses

10  or additional objective medical tests not considered by the treating physician.  The record is silent

11  as to whether the pulmonary function test was one that Dr. Nguyen had considered.  When the

12  evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the

13  evidence, the ALJ has a duty to develop the record.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150

14  (9th Cir.2001).  Accordingly, remand is appropriate to allow the ALJ to develop the record

15  regarding any laboratory tests or clinical findings considered by Dr. Nguyen and to determine

16  whether to afford Dr. Nguyen's assessment of Plaintiff's functional capacity controlling weight

17  or whether there are independent clinical findings that constitute substantial evidence permitting

18  the ALJ to disregard Dr. Nguyen's opinion regarding Plaintiff's functional capacity.

19        Even if Dr. Rios' opinion (and those of the consultative examiners) was "substantial

20  evidence" and the opinion of Dr. Nguyen was not entitled to controlling weight, Section

21  404.1527 still requires deference to the treating physician's opinion.  As discussed above,

22  Section 404.1527 lists several factors that affect the weight afforded to a treating physician's

23  opinion.  Although the ALJ gave "little weight" to Dr. Nguyen's opinion regarding Plaintiff's

24  functional ability "because it [was] contrary to objective medical evidence and inconsistent with

25  [the] record," the ALJ did not discuss all of the relevant factors.  AR 21.  Therefore, if the ALJ

26  determines on remand that Dr. Nguyen's opinion is not entitled to controlling weight, then

27  remand also is appropriate to permit the ALJ to consider expressly the factors listed in Section

28  404.1527(d)(2)-(6).

1

**CONCLUSION**

2        Based on the foregoing, the Court finds that the ALJ's decision is not supported by

3   substantial evidence and is therefore REVERSED and the case is REMANDED to the ALJ for

4   further proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

5   judgment in favor of Plaintiff Robert S. Diana and against Defendant Michael J. Astrue,

6   Commissioner of Social Security.

7

8   IT IS SO ORDERED.

9   **Dated:     August 9, 2007**                              **/s/ John M. Dixon**
                                                    UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28